UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------x
ZINA GARRISON,

                Plaintiff,

                v.

THE UNITED STATES TENNIS
ASSOCIATION, INC.,

                Defendant.
------------------------------------------------x

'09 CIV 1573

ECF Case

09 Civ. JUDGE PRESKA

COMPLAINT

PLAINTIFF DEMANDS
A TRIAL BY JURY

        Plaintiff Zina Garrison, by her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., alleges upon information and belief as follows:

## NATURE OF ACTION

        1.    Plaintiff Zina Garrison ("Garrison" or "Plaintiff"), brings this action against Defendant United States Tennis Association, Inc., ("USTA") for declaratory and monetary relief and damages for injuries Plaintiff has sustained as a result of the USTA's race discrimination against her in the making and enforcing of contracts and the USTA's retaliation against her for opposing racially discriminatory employment practices, all in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

        2.    Defendant subjected Plaintiff to disparate treatment because of her race, by <u>inter alia</u>, refusing to pay her an equivalent salary to that of her white counterpart, Patrick McEnroe ("McEnroe"), Captain of the United States Davis Cup; refusing to negotiate a multi-year contract equal to that provided to McEnroe; demanding, upon pain of contract termination, that Plaintiff meet unrealistic and higher performance benchmarks than those required of McEnroe or of her predecessor and successor, who are not African-American; refusing to renew her contract as

257919 v1

United States Fed Cup Captain, and instead selecting Mary Joe Fernandez ("Fernandez"), a less qualified non-African-American woman who had little to no coaching experience at the national level; and paying Fernandez a higher salary, pursuant to a multi-year contract, than it provided to Garrison. Defendant declined to renew Plaintiff's contract in November 2007. It did so within months after she objected to derogatory and racially stereotyped remarks made by Sara Fornaciari ("Fornaciari"), then Chair of the United States Fed Cup, about Serena Williams, Venus Williams, and Garrison and within weeks after Garrison objected to top USTA officials' racially stereotyped remarks about the Williams sisters. Garrison's objections to Fornaciari's remarks led her to assert that she would "never speak to a Black person again."

## JURISDICTION AND VENUE

3. This Court has original jurisdiction over the matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

4. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this complaint occurred in the Southern District of New York.

## PARTIES

5. Plaintiff Zina Garrison is a citizen of the State of Maryland who resides in Glenn Dale, Maryland. From 2004 through December 2008, Garrison was employed by the United States Tennis Association, Inc., as the Captain of the United States Fed Cup Team. The Fed Cup is the premier team competition in women's tennis. Garrison is African-American.

6. Defendant United States Tennis Association, Inc. ("USTA"), is a not-for-profit corporation organized under the laws of New York, with its corporate headquarters in White Plains, New York. The USTA is the national governing body for the sport of tennis in the

United States. It organizes and promotes the sport from the community level to the professional level.

## FACTUAL ALLEGATIONS

7.  In a sport that has always been predominantly white, Garrison persevered and achieved tremendous success. She began her tennis career at age 10, and rose quickly through the ranks to become the national girls champion at 14. In 1981, Garrison became the first African-American to win both the Wimbledon and U.S. Open Junior titles. In 1984, Garrison won her first top-level singles title at the European Indoor Championship in Zurich, and in 1985, Garrison advanced to the semifinals at Wimbledon. Garrison won both the mixed doubles and the Tour doubles championship at the Canadian Open in 1987. A year later, Garrison won the mixed doubles championship at Wimbledon.

8.  Shortly thereafter, at the 1988 Olympic Games in Seoul, Korea, Garrison became the first African-American to win a gold medal for the United States in women's doubles and the first African-American to win a bronze medal in singles. By the end of 1989, Garrison was ranked number four in the world in singles. In 1990, Garrison defeated number-one ranked Steffi Graf in the semifinals and went on to play Marina Navratilova in the singles finals at Wimbledon. In 1992, Garrison finished as runner-up in the Australian Open women's doubles.

9.  Garrison retired from the Tour in 1996, but stayed active in the tennis world. She continued to coach and develop young players, particularly minority tennis players, throughout the United States. Garrison worked as a television commentator, while also devoting herself to a wide range of activities to advance the sport including: launching the Zina Garrison All-Court Tennis Program in 1993; serving as a partner in the Women's Sports Legend program adult training program; co-founding the AcePlayer Development Program for Minority Excellence

Training Camps in 1999; and serving as the Head Coach for the United States National Tennis Team in 1999.

10. In January 1998, Garrison contacted the USTA to inquire about offering her skills to the United States Fed Cup Team as a coach under Billie Jean King ("King"), the Captain at the time. Tom Gullikson, then Head of USTA High Performance Program, told Garrison that she did not have sufficient coaching experience for the job, even though Garrison had thousands of hours of coaching experience at all levels of the sport. A year later in 1999, Garrison contacted Billie Jean King through a mutual friend and advised her that she was interested in working with the United States Fed Cup Team as King's assistant. Once Garrison had King's support, the USTA agreed to hire her as the United States Fed Cup Team's first-ever Coach. Garrison became the first African-American to serve in a leadership capacity with the United States Fed Cup Team.

11. Garrison served as Coach of the United States Fed Cup Team under King for five years. As Coach, Garrison showed a remarkable talent for evaluating players, physically and mentally, and offering them feedback and instruction to maximize their chances of success. During this period she also strengthened her already significant relationships with some of the top tennis players in the country, including Venus Williams and Serena Williams. The Williams sisters developed a strong loyalty to her as a coach, and then later as Captain of the Fed Cup, as reflected in Venus Williams' frequent public statement, "I play for myself, then Zina, then my country."

12. King decided to retire as Fed Cup Captain in 2004. In order to ensure that the USTA would not pass over Garrison for the Captaincy, King made Garrison's selection as United States Fed Cup Team Captain a condition of her own departure. King informed USTA

officials that there were no other candidates as well prepared to lead the United States Fed Cup Team. Garrison became the first African-American Fed Cup Captain in the event's forty-year history. The USTA also selected Garrison to coach the United States Women's Tennis Olympic Team at the 2004 Athens Olympics. Garrison was the first African-American to hold that position.

13. During Garrison's Captaincy, she coached the United States Fed Cup Team to success, including leading the team to five semifinal appearances despite significant challenges. When three of the team's top players, Lindsay Davenport, Venus Williams, and Serena Williams, could not play due to injuries, Garrison still led an inexperienced Fed Cup Team to the Fed Cup semifinals. The USTA recognized the difficulty of this feat in a December 2006 press release stating that: "Zina took an inexperienced team to the Fed Cup semifinals this year and we believe she is the right person who can take this group of rising American stars to the next level." In April 2007, the USTA again publicly acknowledged Garrison's accomplishments as Captain when it wrote in a press release, "Zina Garrison has guided the U.S. to a 3-3 record, which is impressive, considering that the team played its last three series on the road and lost Venus and Serena to injuries."

14. As Captain, Garrison fostered strong relationships with top players and mentored rising tennis stars. In 2007, the USTA issued a press release in which it praised Garrison for, "[h]er strong relationship with our top players and her proven ability to mentor our up-and-comers." Garrison's relationships with top players paid off in 2007 when Venus and Serena Williams, Lisa Raymond and Vania King agreed to play for the United States in the Fed Cup. Serena Williams was ultimately unable to play due to injuries.

15. Despite the USTA's public statements about Garrison's strong performance as Captain, in private USTA officials focused almost exclusively on Garrison's ability to recruit the two top African-American players, Venus and Serena Williams, for the United States Fed Cup Team. USTA officials rarely inquired about Garrison's ability to recruit non-African American top players, such as Lindsey Davenport.

16. From the beginning of Garrison's Captaincy, the USTA failed to give her the same support that it provided to the previous Captain, King, or to her white counterpart, McEnroe, the Captain of the Davis Cup team. The year Garrison took over as Captain of the United States Fed Cup Team, the USTA slashed her players' salaries and bonuses, making it more difficult to attract the top players. Prior to the cuts, every player could expect to earn at least $50,000 for a weekend of playing the Fed Cup. After the cuts, only players who were ranked in the top 10 in the Tour were guaranteed $50,000, a criterion that excluded almost all American players. In stark contrast, the USTA did not subject the Davis Cup players to substantial pay cuts. Despite this challenge, Garrison was able to draw on her well-deserved reputation for coaching excellence and her strong relationships with top U.S. players to ensure that the United States Fed Cup team remained competitive.

17. The USTA failed to provide Garrison or the Fed Cup team she coached with adequate support. The USTA never gave Garrison more than a token raise and gave her only one-year contracts, while it provided McEnroe with significantly higher compensation and multi-year contracts. This disparity continued even though Garrison's Fed Cup team had a better record overall than McEnroe's team through much of Garrison's tenure as Fed Cup Captain. Although the Fed Cup Team repeatedly surpassed expectations, the USTA leadership threatened

Garrison with termination of her contract if the Fed Cup team did not reach specific, unrealistic, benchmarks – benchmarks not imposed on McEnroe or her predecessor King.

18. During Garrison's tenure as the United States Fed Cup Team Captain, the USTA subjected Garrison to a climate of demeaning racial comments and attitudes. In January 2007, the USTA selected Sara Fornaciari, a close associate of USTA's then President, Jane Brown Grimes ("Grimes"), to serve as Chair of the Fed Cup. In this capacity, Fornaciari, who is white, became Garrison's direct supervisor.

19. Fornaciari's selection concerned Garrison and minority players who were aware of Fornaciari's history of making inappropriate and racially charged remarks. Fornaciari, for example, routinely referred to Garrison, as the "Black Ghost," a name she unfairly used to impugn Garrison's reliability.

20. In July 2007, the Fed Cup semifinals were to be played in Stowe, Vermont. Several days before these semifinal matches, Serena Williams advised Garrison that she would be unable to compete due to an injury which subsequently side-lined her for weeks. When Garrison reported this to Jim Curley ("Curley"), the Managing Director of Tournament Operations at the USTA, he urged Garrison to pressure Serena Williams to play despite her injury, and strongly implied that she was not injured enough to sit the match out – a suggestion Garrison heard repeatedly from USTA officials when African-American players reported injuries, but never when white players reported injuries.

21. In July 2007, at the Fed Cup semifinals in Stowe, Vermont, Fornaciari told Garrison after she finished a media interview, "That was the most intelligent media comment I have ever heard you give"; Fornaciari thus implied that Garrison was generally inarticulate and

stupid. Garrison was insulted by the tenor and tone of her remarks and quickly left the conversation.

22. A few weeks later, at the US Open in August 2007, Fornaciari approached Garrison and, in a condescending tone, told her that she should go over to the USTA tent to network at a USTA sectional event that was underway because it would allow Garrison to "get a lot of minority business." Garrison was troubled by the implication of Fornaciari's statement that she could network only with other minorities. To clarify Fornaciari's meaning, Garrison asked her if she thought that Garrison could effectively network only with other people of color. Fornaciari stammered an excuse that she networked with African-Americans and that she believed Garrison should do so too. Garrison again left the conversation troubled by Fornaciari's remarks.

23. Garrison was so disturbed by Fornaciari's racially stereotyped comments that she called her in October 2007 to discuss them. In placing this call, Garrison sought to mend her relationship with Fornaciari by providing an opportunity to discuss any misunderstandings and to address Garrison's concerns.

24. During this call, Garrison told Fornaciari that she was unhappy with Fornaciari's comments because she felt they had racist implications. In response, Fornaciari launched into a vitriolic attack against Garrison and other African-Americans, including the Williams sisters. She told Garrison that she was trying to "help" her, stating, "Let's face it, you can't talk. Nobody ever knows what you are saying." Fornaciari also told Garrison, "You need to get it; you are not a spokesperson." Garrison responded that Fornaciari's charge that she was inarticulate had a racist undertone, especially because Garrison had extensive experience as a spokesperson and professional television commentator. During the course of this conversation,

Garrison advised Fornaciari that she needed to be more sensitive with her remarks and noted that other African-Americans associated with the USTA also had the impression that she was racist. In response to Garrison's statements, Fornaciari became irate and announced in a loud and angry tone, "That's it. I will never speak to another Black person again!"

25.    Fornaciari followed up this statement by launching into an attack on Venus and Serena Williams, the two most high-profile African-American players on the Tour and two of the best players in the world. She complained that Venus Williams had not yet returned her telephone call or committed to an event that Fornaciari was planning in Washington, D.C. She stated, "Who does Venus think she is to pass up $50,000?" and then exclaimed that Venus was "like you and just like Serena; none of you call people back." Garrison was stunned by Fornaciari's comment lumping the Williams sisters and her into a "you people" category and implying that African-Americans are lazy, unresponsive, and not sufficiently grateful.

26.    During the conversation referenced in paragraphs 24 and 25, above, Fornaciari, who had minutes earlier aggressively announced that she would never speak to a Black person again, reversed course and treated Garrison in a condescending manner, insisting that she wanted to "help" her. She also said that she wanted to talk with Grimes, the then President of USTA, on Garrison's behalf about her continued role with the United States Fed Cup Team. Fornaciari suggested, for the first time, that Garrison's status as Captain was in jeopardy. She concluded the conversation by demanding that Garrison have dinner with her to discuss how she might "help" Garrison with her status at the USTA.

27.    In early November 2007, Garrison sent Fornaciari an email declining her dinner invitation. She did so because she was offended by Fornaciari's comments and tone during their last conversation. In response, Fornaciari launched into another tirade against Garrison in which

she again demeaned Garrison's speaking abilities and accused her of being inarticulate. Fornaciari wrote, "This is exactly what I am talking about" and went on to state that Garrison needed to learn how to "write a letter, learn proper grammar, and use verbs and punctuation."

28.     In mid-November 2007, the USTA required Garrison to interview for the position of Fed Cup Captain for 2008 and beyond. Upon information and belief, the USTA never required either McEnroe or Garrison's predecessor to re-interview for their Captaincy positions upon the conclusion of their contracts. Rather, the USTA summarily renewed their contracts.

29.     Prior to the interview referenced in paragraph 28, above, Garrison had spoken with Curley, the Managing Director of Tournament Operations at the USTA, about the disparate treatment to which she had been subjected. She specifically asked about why the terms and conditions of her employment were consistently inferior to those of McEnroe, and why the USTA refused to provide her with a multi-year contact as it did for McEnroe. Curley refused to discuss the USTA's discriminatory treatment of Garrison and responded that Garrison could not compare herself with McEnroe because she had "never gotten the top players." This assertion was false.

30.     Throughout her tenure, Garrison had consistently arranged for top-level athletes to play for the United States Fed Cup Team, despite the USTA's slashing of the Fed Cup players' income. In 2004, Garrison recruited Venus Williams and Lisa Raymond to play for the United States Fed Cup team. In 2005, she again recruited Venus Williams and also recruited Lindsay Davenport. In 2007, Garrison recruited Venus Williams, Serena Williams, and Lisa Raymond to play for the U.S. Fed Cup team. And in 2008, Garrison recruited Lindsay Davenport, Lisa Raymond, and Liezel Huber to play for the team.

31. During the conversation referenced in paragraph 29, above, Garrison explained to Curley then, as she had on many prior occasions, that she had succeeded in recruiting the top players including the Williams sisters and Lindsay Davenport, but that injuries often prevented them from competing. Curley, like other USTA officials, questioned whether the Williams sisters were actually injured, and suggested that they – but not the white players – were unreliable and were using injuries as an excuse not to play. Garrison objected to this unfair and baseless criticism which she believed was based on racially stereotyped views of the Williams sisters as lazy and unreliable. In response to Garrison's objections, Curley threatened that if Garrison did not lead the United States Fed Cup team to the finals in the next Fed Cup, the USTA would not consider her Captaincy successful.

32. In mid-November 2007, the USTA required Garrison to interview for the position of Fed Cup Captain with Grimes, Curley, and Arlen Kantarian ("Kantarian"), the then Chief Executive Officer of the Professional Tennis Division of the USTA. During the course of this interview, Garrison again inquired why the USTA refused to provide her with a contract similar to the one it provided to McEnroe. Grimes repeated Curley's earlier unfounded statement, that Garrison had not earned such terms of employment because of her failure to attract top players. Garrison responded by asking if any other coach or captain had been required to lead a team to the finals upon pain of dismissal. The USTA officials had no response. Garrison sought to explain the negative impact that this requirement had on her; she described the anxiety of watching her team struggle in the third set of a tournament, knowing that she might lose her job if her team did not advance. The USTA officials again refused to respond, but instead asked her whom she would name as her successor when she retired from the Fed Cup Captaincy. Garrison

responded that she did not feel comfortable answering the question and emphasized that she had no plans to relinquish her position.

33. In late November 2007, only a few weeks after being subjected to Fornaciari's racist tirade and within days of Garrison's objections to the racially stereotyped characterizations of the Williams sisters made by USTA officials, Kantarian and Curley informed Garrison that her contract as Captain of the United States Fed Cup Team would not be renewed in 2009 and that 2008 would be her terminal year. Fornaciari was not present at the meeting. However, upon information and belief, she participated in earlier discussions with Grimes and others at the USTA about the USTA's decision not to renew Garrison's contract with the USTA and advocated for Garrison's removal.

34. In Garrison's place, the USTA selected Fernandez to be the Captain of the 2009 United States Fed Cup Team. Upon information and belief, USTA signed a three-year contract with Fernandez, which guaranteed her a year (2008) as the US Fed Cup Team's Coach and Garrison's direct report followed by two years (2009 – 2010) replacing Garrison as Captain. USTA also contracted to pay Fernandez a higher salary than it paid Garrison even though Fernandez had little to no coaching experience at the national level and no team coaching experience

35. Garrison was stunned with this news because despite her high regard for Fernandez as a tennis player, she knew that Fernandez was far less qualified than she for the Captain position. Moreover, it was a deviation from the USTA's standard practice for Garrison not to be allowed to help select her coach for 2008, since Garrison, not the USTA, had chosen her previous Fed Cup coaches as was standard practice in professional tennis. However, without

consulting Garrison, the USTA had already hired Fernandez to serve as Coach for the 2008 Fed Cup Team.

36. When Garrison asked Curley and Kantarian why her contract was not being renewed, Kantarian told her that it was because she was not able to get the top players to play for the United States Team. Garrison refuted this statement by pointing out that she did in fact get the top players to play the Fed Cup, and could not be held responsible when the top players suffered from injuries and were unable to play. Kantarian simply responded that Garrison had to accept the situation.

37. The reasons that the USTA asserted for not renewing Garrison's contract were a pretext for its unlawful motivation to replace her with a non-African-American Captain. Later through other sources within the USTA, Garrison learned that the USTA wanted someone to put on a "public face" to the United States Fed Cup, and concluded that Garrison did not have "the look" that it was trying to promote.

38. On December 17, 2007, the USTA issued a press release announcing the hiring of Fernandez as 2008 Coach and 2009 Captain of the United States Fed Cup Team. The USTA had never before announced the appointment of a new captain while the old captain was still serving. When Garrison contacted Kantarian to complain about this humiliating treatment, he agreed that the press release was "probably a bad idea," but took no action to remediate the reputational harm to which Garrison had been subjected. To the contrary, the USTA continued to promote Fernandez heavily and to downplay in the media Garrison's ongoing role as Fed Cup Captain, which caused further reputational damage to Garrison.

39. The USTA's unjustified, abrupt, and unnecessarily public non-renewal of Garrison's contract, as well as its decision to replace Garrison with a lesser qualified candidate,

has humiliated Garrison and damaged the professional reputation she has worked a lifetime to build.

40. The USTA's discriminatory treatment of Garrison is part of the USTA's pattern and practice of discrimination against African-American employees and professionals in the terms and conditions of their employment and in the making and enforcement of contracts.

41. In 2006, after the New York Attorney General concluded that the USTA had engaged in unlawful race and sex discrimination against umpires, the USTA entered into an Assurance of Discontinuance Pursuant to Executive Law 63(15) with the State of New York on August 28, 2006, whereby it was contractually obligated for two years inter alia to ensure compliance with Section 8-107(1) of the New York City Administrative Code and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Upon information and belief, the USTA has failed to comply with the terms and conditions of the Assurance and continues to engage in unlawful race discrimination.

42. Defendant USTA maintains a pattern of race discrimination in employment by:

a) Failing to maintain a hiring and promotion policy that is based on objective job-related criteria that are uniformly applied to African-American and white employees;

b) Failing to promote African-American employees to higher-level managerial positions, and relegating African-Americans to jobs with less visibility, prestige, responsibility and prospects for promotion than those held by equally or less qualified white employees; and

c) Dismissing African-American employees in numbers disproportionate to their numbers within the USTA and more often than it terminates white employees.

43. The USTA's efforts to increase sensitivity to racism through its diversity initiative have been ineffective. Founded more than 15 years ago, the USTA's diversity initiative has made little if no impact because it lacks a formal process for addressing complaints about racism and is under-resourced and trivialized within the Organization. In its USTA Diversity Plan: Multicultural Focus 2006-2008, the USTA admitted that, despite its 15-year-old diversity initiative, the USTA continues to have "a pervasive lack of organizational understanding and awareness of what diversity is[] and the degree to which it is present and/or absent in the organization." Upon information and belief, in or around October 2008, Karlyn Lothery, the Chief Diversity Officer, resigned her employment in frustration over the USTA's failure to implement the changes outlined in the Diversity Plan. Furthermore, upon information and belief, the USTA has demonstrated its lack of interest in its diversity initiative by allowing the staff of the Diversity Office to shrink from four employees to one employee.

44. By letter to the USTA dated July 3, 2008, Garrison, through counsel, detailed her allegations of race discrimination and retaliation. The USTA failed to take corrective action, and has instead in an effort to justify its unlawful employment action directed its public relations team to make negative comments about Garrison impugning her record as United States Fed Cup Captain. The USTA has also failed to invite Garrison to events where she should be included, by virtue of her tennis record, and has, for example, not provided her with opportunities to play in U.S. Open Masters matches or other professional opportunities.

I.  <u>Discrimination in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981</u>

45. Plaintiff hereby incorporates by reference as though restated each of the factual allegations in paragraphs 1 through 44 above.

46. The Civil Rights Act of 1866 ("Section 1981") prohibits discrimination on the basis of race in the making, enforcement, performance, modification, and termination of contracts, including employment contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

47. Defendant subjected Plaintiff to discriminatory treatment on the basis of race in the making and enforcement of contracts, by, <u>inter alia</u>, failing to renew her contract as Captain of the United States Fed Cup for 2009 and by paying her lesser-qualified successor a higher salary pursuant to a multi-year contract.

48. Defendant's actions described above constitute discrimination in violation of Section 1981.

49. Defendant engaged in its discriminatory actions with malice and with reckless indifference to Plaintiff's federally protected rights.

50. Defendant's actions described above directly and proximately have caused, and continue to cause, Plaintiff to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, anguish, pain and suffering, humiliation, indignity, personal embarrassment, and damage to her professional reputation.

II.     <u>Retaliation in Violation of the Civil Rights Act of 1866, 42 U.S. C. § 1981</u>

51. Plaintiff hereby incorporates by reference as though restated each of the factual allegations in paragraphs 1 through 50 above.

52. Section 1981 prohibits retaliation for a person's opposition to race discrimination in the making, enforcement, performance, modification, and termination of contracts, including employment contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

53. Plaintiff opposed the USTA's racially discriminatory practices by objecting to derogatory and racially stereotyped remarks made by USTA and Fed Cup Officials about Serena and Venus Williams and Garrison.

54. Defendant chose not to renew Plaintiff's contract in November 2007, within months after Garrison objected to derogatory and racially stereotyped remarks made by USTA Officials, including Fornaciari, then Chair of the United States Fed Cup.

55. Defendant's actions described above constitute retaliation in violation of Section 1981.

56. Defendant engaged in its retaliatory actions with malice and with reckless indifference to Plaintiff's federally protected rights.

57. Defendant's actions described above directly and proximately have caused, and continue to cause, Plaintiff to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, anguish, pain and suffering, humiliation, indignity, personal embarrassment, and damage to her professional reputation.

## REQUESTED RELIEF

NOW, WHEREFORE, Plaintiff prays this court for the following relief:

1. Issuance of a declaratory judgment that defendant discriminated against Plaintiff in violation of the Civil Rights Act of 1866;

2. Issuance of a declaratory judgment that defendant retaliated against Plaintiff in violation of the Civil Rights Act of 1866;

3. An award to Plaintiff of damages of back pay, front pay, and other equitable relief as provided by Section 1981;

4. An award to Plaintiff of compensatory damages in an amount to be proven at trial;

5. An award to Plaintiff of punitive damages in an amount to be proven at trial;

6. An award to Plaintiff of prejudgment interest;

7. An award to Plaintiff of reasonable attorneys' fees and costs; and

8. All other relief the court deems just.

### JURY DEMAND

Plaintiff hereby demands a jury trial in this action pursuant to Rule 38(b) of the Federal Rules of Civil Practice.

Dated: New York, New York
February 19, 2009

VLADECK, WALDMAN, ELIAS
& ENGELHARD, P.C.

By: *Anne Vladeck*
Anne C. Vladeck (AV 4857)
Debra L. Raskin (DR (5431)
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036-5560
(212) 403-7300


Debra S. Katz
Lisa J. Banks
Alexis Rickher
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Washington, D.C. 20009
(202) 299-1140